211 A.2d 276.

HARRY H. HART *vs.* BOARD OF ELECTIONS.
HARRY H. HART *vs.* BOARD OF ELECTIONS.

JUNE 23, 1965.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

POWERS, J. These are two petitions for certiorari seeking to quash separate but related decisions of the respondent board made in passing on the validity of certain ballots cast for the office of town councilman in the third council district of the town of Tiverton at the general elections held November 3, 1964. We issued the writ in each case and pursuant thereto the relevant papers were duly certified to this court. Because of our conclusion in each case we deem it advisable to consider them together so that they may be reported in a single opinion.

Moreover, although in the second case, M. P. No. 1714, the writ was issued subsequent to the issuance of the writ

in the companion petition, a logical sequence is best achieved by first considering the merits of the second filed petition.

It appears from the records in M. P. No. 1714 that petitioner was the incumbent and candidate for re-election to the office of councilman for the third district in the town of Tiverton and was opposed for that office by Ralph C. Wells, hereafter referred to as the intervenor, at the general election held November 3, 1964.

When all of the ballots cast at the election for the office in question were counted by the local board of canvassers it was determined that petitioner had a total of 280 votes and the intervenor had a total of 286 votes. Included in petitioner's total, however, was a vote cast by absentee ballot.

It further appears that a municipal absentee ballot as prepared by the secretary of state has on the face of it at least two vertical columns, one for each of the major political parties. At the top of each such column is the symbol of the appropriate political party, beneath that a circle, and below the circle the name of the corresponding political party. There then follows in vertical succession rectangular boxes within each of which is printed the office and the name and address of the party candidate for such office. To the right of each such rectangular box is a smaller box within which the voter marks a cross (X) to vote for the candidate of his choice when voting a split ticket.

However, where a municipal office is confined to a district within any municipality, the name and address of the candidate does not appear. In lieu thereof there appears the following, "A vote for this office is a vote for the appropriate candidate of the [name] party whose name appears on the reverse side." This arrangement is used by the secretary of state to avoid the necessity of printing multiple ballots for a single municipality. In the city of Providence, for example, there are thirteen wards with two coun-

cilmen elected from each ward. Thus thirteen separate ballots would be required for that city if recourse were not had to the method used by the secretary of state.

In the instant case six ballots are required for the reason that Tiverton is divided into six council districts. However, every absentee ballot printed for the Tiverton municipal election and distributed to each qualified elector who made application therefor had printed on its face but one box for the office of a council district stating "For Town Council" and the language previously quoted in lieu of the candidate's name and address. On the reverse side of the ballot there appear the names of each party's candidate for each council district as well as for the office of district moderator and clerk.

The vote for petitioner which is in question was cast not by marking a cross (X) in the box to the right of the rectangle designated "For Town Council" but rather was placed to the right of petitioner's name where it appeared on the reverse side of the ballot. Consistently the voter also adopted this method in voting for the office of district moderator casting no vote for the office of clerk.

In considering this ballot the local board of canvassers treated it as a valid vote for petitioner and from its action the intervenor appealed to respondent board pursuant to the provisions of G. L. 1956, §17-7-5, as amended. From a ruling of respondent board reversing the action of the local board of canvassers, a review thereof was sought in this court by way of certiorari.

The respondent board based its decision on the provisions of §17-20-18, as amended, which require an absentee voter to make his cross (X) in the square provided to the right of the candidate's name. It and the intervenor acknowledge the intent of the voter in question to have cast his or her ballot for petitioner, but argue that although the intention of the voter is material such intention is unavailing if con-

trary to an expressed statutory requirement, citing *In re Petition of Wilcox*, 27 R. I. 117.

That case clearly stands for the proposition for which it is cited but it must be read in the light of the then prevailing applicable statutory provisions, P. L. 1904, chap. 1197. It is clear from a reading thereof that in the *Wilcox* case this court was of the opinion that it was bound to give a strict and literal construction to language which the court defined as "imperative." Nothing in chap. 1197 either expressly or impliedly directed judicial liberality in ascertaining the intention of the voter.

The statutory provisions governing the case before us, however, give significant direction. Section 17-20-19, as amended, reads in pertinent part, "No ballot shall be rejected if the intention of the voter is clear unless it contains clear evidence of the identity of the voter." Further, §17-20-26, as amended, provides, "This chapter shall be construed liberally to [effect] the purposes hereof."

We are persuaded that in the light of the circumstances of the instant case the vote in question should not be invalidated either on the ground that it was not cast in compliance with the applicable statute or that by marking a cross (X) to the right of petitioner's name on the reverse side of the ballot there is clear evidence of the identity of the voter. Section 17-20-18 provides that an absentee voter not voting a straight ticket may mark a cross (X) in the square opposite the name of the candidate chosen. However, in the block where there would ordinarily appear the name of petitioner, the ballot contains in lieu thereof the information heretofore quoted. This, as has been observed, was done to avoid the printing of six separate municipal ballots for the town of Tiverton.

The ballot was thus arranged by the secretary of state in accordance with §17-20-12, as amended, which provides that

absentee and shut-in ballots shall be arranged so as to conform with the style provided by §17-21-20, as amended. The economies thus achieved as well as the expediting of ballots are readily apparent, but the absence of the candidate's name where it would normally appear, coupled with the fact that the name does appear on the reverse side of the ballot, may tend to confuse a voter notwithstanding the printed instructions on the face of the ballot.

With the enactment of P. L. 1889, chap. 731, entitled "An Act To Provide For Printing And Distributing Ballots At The Public Expense, And To Regulate Voting At State And Congressional Elections," the legislature, acutely aware of fraudulent practices which led to the furnishing of ballots by the state, expressly invalidated a ballot which had been marked in any manner that could be identified with the voter, intending thereby to minimize by making more difficult the buying of votes at the polls. From this imperative legislative mandate there followed numerous decisions of this court, all of which laid emphasis on the legislative precaution against voter identification by means of a distinctive mark.

However, in *Fortin* v. *Board of Aldermen,* R. I., 135 Atl. 360, this court without the sanction of a legislative directive indicated a tendency toward judicial liberality so as to preserve the voting franchise without doing violence to the requirements established by the legislature whenever possible. It seems to us that in the light of the heretofore quoted provisions of the statutes regulating absentee voting, we observe the spirit of those statutes in the manner intended by the legislature by holding that the vote for petitioner was properly included by the local board of canvassers when it determined that he had a total of 280 votes.

Having reached this conclusion we now turn to a consideration of the merits in the first case, M. P. No. 1689.

It appears from the record that respondent board rejected as invalid a total of six shut-in votes cast by electors of the third council district. It based its decision on the fact that the outer envelope in each case bore the postmark of Fall River, Massachusetts. The board held that not having been mailed within this state the ballots were mailed in violation of statutory requirements.

The petitioner contends that the ruling of respondent board runs contrary to the provisions of §17-20-12, which provides in pertinent part: "A shut-in voter may mark and cast such ballot only within the state of Rhode Island; and an absentee voter may mark and cast such ballot only outside the state of Rhode Island, and shall mail the same from without the state of Rhode Island. The post-mark, if legible, shall be conclusive evidence of the place of mailing."

The legislature, he argues, recognizing that the privilege extended to the absentee voter is predicated on an absence from the state, expressly provided that an absentee ballot must be marked or cast as well as mailed outside of the state, but made no requirement as to the place of mailing in the case of the shut-in voter. This he further argues was deliberately intended by the legislature because it was aware that a shut-in, unlike an absentee, was dependent on others to see that the ballot arrived in the hands of respondent board.

We are persuaded that there is merit in these arguments. Article XXXIV of amendments to the state constitution expressly grants to the legislature the right to regulate the time, place and manner of voting. Pursuant thereto, the general assembly has by implication provided that marking shall constitute the casting of one's ballot and, with reference to the receipt thereof by respondent board, expressly required that only an absentee ballot shall be mailed. Indeed the intervenor concedes that pursuant to the provisions of §17-20-18 a shut-in ballot may be hand delivered to respondent board.

Even so respondent board and the intervenor argue that there are two positive provisions of the election laws, §§17-20-11 and 17-20-21 (c) (a), as amended, which properly interpreted clearly indicate that a shut-in ballot must be mailed within this state.

Section 17-20-11 authorizes the appointment of bipartisan pairs of supervisors whose duties call for visiting hospitals and convalescent homes to supervise casting of votes by shut-in voters who are residents. The pertinent language thereof relied on by respondent and the intervenor is as follows:

> "They shall supervise the casting of votes by persons using shut-in voter's ballots at such place so as to preserve their secrecy and shall take acknowledgments or serve as witnesses, and jointly provide assistance, if requested, to assure proper marking, sealing and mailing of ballots as voted."

It is contended that in providing for the *"proper* marking, sealing and *mailing"* the legislature manifested a requirement that can only be construed as calling for the mailing of shut-in ballots in Rhode Island. (italics ours)

At first blush this contention has plausibility. Upon consideration of the attendant conditions to which "proper * * * mailing" attaches, however, a more significant interpretation becomes readily apparent. This language relates only to shut-in voters, residents of hospitals and convalescent homes who, not living with relatives in whom a sense of confidence normally reposes, very well might in the judgment of the legislature be protected against embarrassment, if not misgivings, by providing shut-in voters so situated with a sense of confidence resulting from the assistance of at least one fellow partisan who could be counted upon to make certain that the voter's choice would be honored. No discussion is required to make the point that in the case of shut-in voters there is frequently a necessary invasion of privacy as there is with voters who

require assistance at the polls. They also are assisted in effectuating their vote by a bipartisan pair of supervisors and secrecy or privacy yields to an assurance of confidence for the voter and protection against possible fraud.

We think that such was the design of the legislature when it employed the language on which respondent board and the intervenor rely. Our belief gathers support from the fact that the quoted language is immediately followed by the words "of ballots *as voted*." (italics ours) It seems to us that the words "as voted" have a deliberate significance.

The other section, §17-20-21 (c) (a), establishes the procedures for processing war, absentee and shut-in ballots by respondent board which is required, among other duties, to ascertain "that the origin or mailing point of such absentee or shut-in ballot is proper." It is contended, in effect, that "origin" and "mailing point" are made synonymous by the use of the disjunctive "or." We are not so persuaded.

As heretofore observed, the statutes require that the point of origin of a shut-in ballot must be within Rhode Island while the place of origin of an absentee ballot must be without the state, but the latter explicitly must be mailed from outside of the state while shut-in ballots are not required to be mailed at all.

We conclude that the statute contemplates the place where a ballot, shut-in or absentee, is cast as being the point of origin but that the place where mailed has reference only to absentee ballots.

In our judgment a contrary conclusion would be inconsistent with a liberal construction of the legislature's intent, as expressed by its language in extending the voting privilege to those qualified electors "who are absent from the state, or who, by reason of old age, physical disability, illness or other physical infirmities, are unable to vote in person." Art. XXXIV of amendments, Rhode Island Con-

stitution. Moreover such contrary conclusion would indicate an inability on our part to comprehend the differing circumstances or nature of the problems of those electors whom the people intended to assist by their constitutional fiat. We hold, therefore, that a shut-in ballot is not invalid by reason of having been mailed outside the state.

Having decided in M. P. No. 1714 that the petitioner had a total of 280 votes, and it appearing that if each of the six shut-in ballots contains a vote for the petitioner he and the intervenor will have an identical total of votes, resulting in no election, the respondent board is directed to process said shut-in ballots and forward them to the local board for tabulation.

In M. P. No. 1714 the petition for certiorari is granted. the decision of the respondent board is quashed, and the papers certified in the cause are ordered returned to the respondent board with our decision endorsed thereon.

In M. P. No. 1689 the petition for certiorari is granted, the decision of the respondent board is quashed, and the papers certified in that cause are ordered returned to the respondent board for further proceedings in accordance with our opinion therein.

CONDON, C. J. I concur in the decision in M. P. No. 1714 although I am frank to say that the court in my opinion goes to the very limit of liberality in approving so wide a departure from the language of the statute and the express instructions thereunder to the voter.

I dissent from the decision in M. P. No. 1689. In my opinion the court has gone far beyond the limits of liberality in construing the plain, unequivocal language of the statute. I cannot help but feel that by this decision we have opened the door wide for serious trouble if not actual fraud in the manipulation of shut-in votes in the future. In construing the election statutes which the legislature in its wisdom has enacted to protect the purity of the elec-

tive process our first consideration ought to be the preservation of the sanctity of the ballot. With due respect to the opinion of my brethren I do not think we do that here.

*Sheffield & Harvey, Ray H. Durfee,* for petitioner.

*James E. Holland, Stephen F. Achille,* for respondent.